[No. 45641.   En Banc.   May 10, 1979.]

THE STATE OF WASHINGTON, *Respondent*, v. ERNEST L. OLSON, *Petitioner*.

*Luvera & Mullen* and *G. E. Mullen,* for petitioner.

*Robert E. Schillberg, Prosecuting Attorney,* and *Don Hale* and *Elmer E. Johnston, Jr., Deputies,* for respondent.

ROSELLINI, J.—The Superior Court dismissed this first–degree perjury indictment at the conclusion of the State's case, holding that there was insufficient evidence to support a verdict of guilty. The Court of Appeals, Division One, reversed, finding sufficient circumstantial evidence from which the falsity of the petitioner's testimony, and his knowledge of that falsity, could be inferred. *State v. Olson,* 19 Wn. App. 885, 578 P.2d 866 (1978).

We granted a petition for review upon a showing that the facts of the case present a question of first impression in this state, and that the decision of the Court of Appeals is in apparent conflict with the rules followed by the United States Supreme Court and courts of other states.

A challenge to the sufficiency of the evidence admits the truth of the opposing party's evidence and all

inferences which reasonably may be drawn from such evidence, and requires that the evidence be interpreted in the light most favorable to that party. Since this is a perjury case, however, it must also be kept in mind that the requirements of proof in such cases are the strictest known to the law, outside of treason charges. In such cases, the State must present:

1. The testimony of at least one credible witness which is positive and directly contradictory of the defendant's oath; and

2. Another such direct witness or independent evidence of corroborating circumstances of such a character as clearly to turn the scale and overcome the oath of the defendant and the legal presumption of his innocence. *State v. Buchanan,* 79 Wn.2d 740, 489 P.2d 744 (1971); *State v. Wallis,* 50 Wn.2d 350, 311 P.2d 659 (1957).

The State's evidence showed that the petitioner, a former employee of Snohomish County, had once done work for a construction company in Stanwood, named Spane Building. While employed by the county, he delivered bridge timbers to Spane Building. He was subpoenaed in 1976 to appear before a Snohomish County grand jury investigating unauthorized disposal of county property. Before the grand jury, he testified that he had delivered county–owned bridge timbers to approximately eight private individuals and a gun club, at the direction of his superiors, and had usually received a fifth of whiskey for the delivery.

With regard to the delivery of such timbers, he was specifically asked whether he had ever had occasion to take bridge timbers "from the District Three yard to the Spane Mill." He answered, "No, I did not." He also testified that he was not aware of anyone else making deliveries to the Spane Mill, or of employees of the Spane Mill coming to the District Three lot to pick up timbers.

When evidence was presented before the grand jury that the petitioner had delivered bridge timbers to Spane Building, this perjury indictment was found.

It is undisputed that when the interrogator asked the petitioner about delivering bridge timbers to the Spane Mill, he, the interrogator, had in mind the construction company named Spane Building. It was the theory of the State on this perjury charge that the petitioner knew the reference was to Spane Building and that he deliberately lied about delivering timbers to that place. The State was unable to produce any evidence that the petitioner had ever referred to the business as the Spane Mill or that he had been in the presence of others who referred to it in that manner. It did, however, produce witnesses who testified that "the Spane Mill" was a name, among a number of others, used by some persons to describe the business, and further testimony that there was no other business in the community which bore the name of Spane. There was no direct evidence that the petitioner was aware of either of these facts. There was also no direct evidence that the petitioner knew that the grand jury interrogator meant Spane Building when he said Spane Mill.

That Spane Building was a construction company engaged in constructing farm buildings, warehouses, and the like, was not disputed by the State. It maintains, however, that since the business had in its yard certain equipment which can also be found in a mill, it could reasonably be identified as such.

The Court of Appeals concluded that the jury could infer from the circumstantial evidence that the petitioner's testimony before the grand jury was false and that he knew it was false.

■ Unless the name "the Spane Mill" was so commonly used to describe the business to which the petitioner delivered timbers that it could be regarded as its de facto name, his response to the question posed to him was literally and technically true. It is the general rule that a perjury charge cannot be maintained where the testimony of the accused was literally, technically, or legally true. The cases are collected in 69 A.L.R.3d 993 (1976). This has long been the rule, where the answer given by the accused is responsive to

the question asked him. *United States v. Wall,* 371 F.2d 398 (6th Cir. 1967); *Galanos v. United States,* 49 F.2d 898 (6th Cir. 1931); *Smith v. State,* 66 Ga. App. 669, 19 S.E.2d 168 (1942); *People v. Criscuoli,* 164 App. Div. 119, 149 N.Y.S. 819 (1914); *People v. Pearson,* 98 Ill. App. 2d 203, 240 N.E.2d 337 (1968); *In re Rosoto,* 10 Cal. 3d 939, 519 P.2d 1065, 112 Cal. Rptr. 641, 69 A.L.R.3d 953 (1974).

The United States Supreme Court has held that under the federal perjury statute, even an evasive answer, if literally true, even though intended to be misleading, cannot constitute perjury. *Bronston v. United States,* 409 U.S. 352, 34 L. Ed. 2d 568, 93 S. Ct. 595 (1973). We note that the federal statute is more severe than our present Washington statute, since it punishes one who willfully makes false statements which he does not believe to be true (18 U.S.C. § 1621), whereas RCW 9A.72.020 requires proof that the speaker knew his statement to be false.[1]

Exploring the rationale of the general rule, from which only Oklahoma appears to deviate, the United States Supreme Court said:

> The seminal modern treatment of the history of the offense concludes that one consideration of policy overshadowed all others during the years when perjury first emerged as a common–law offense: "that the measures taken against the offense must not be so severe as to discourage witnesses from appearing or testifying." Study of Perjury, reprinted in Report of New York Law Revision Commission, Legis. Doc. No. 60, p. 249 (1935). A leading 19th century commentator, quoted by Dean Wigmore, noted that the English law "throws every fence round a person accused of perjury," for
>> "the obligation of protecting witnesses from oppression, or annoyance, by charges, or threats of charges, of

---

[1] "(1) A person is guilty of perjury in the first degree if in any official proceeding he makes a materially false statement which he knows to be false under an oath required or authorized by law.

"(2) Knowledge of the materiality of the statement is not an element of this crime, and the actor's mistaken belief that his statement was not material is not a defense to a prosecution under this section.

"(3) Perjury in the first degree is a class B felony." RCW 9A.72.020.

having borne false testimony, is far paramount to that of giving even perjury its deserts [*sic*]. To repress that crime, prevention is better than cure: and the law of England relies, for this purpose, on the means provided for detecting and exposing the crime at the moment of commission,—such as publicity, cross–examination, the aid of a jury, etc.; and on the infliction of a severe, though not excessive punishment, wherever the commission of the crime has been clearly proved." W. Best, Principles of the Law of Evidence § 606 (C. Chamberlayne ed. 1883).

See J. Wigmore, Evidence 275–276 (3d ed. 1940). Addressing the same problem, Montesquieu took as his starting point the French tradition of capital punishment for perjury and the relatively mild English punishment of the pillory. He thought the disparity between the punishments could be explained because the French did not permit the accused to present his own witnesses, while in England "they admit of witnesses on both sides, and the affair is discussed in some measure between them; consequently false witness is there less dangerous, the accused having a remedy against the false witnesses, which he has not in France." Montesquieu, The Spirit of the Laws, quoted in Study of Perjury, *supra*, p. 253.

409 U.S. at 359–60.

As the high court said there, perjury statutes are not to be loosely construed, nor are they to be invoked simply because a wily witness succeeds in derailing the questioner, so long as the witness speaks the literal truth. The burden is on the questioner to pin the witness down to the specific object of his inquiry. Precise questioning, the court said, is imperative as a predicate for perjury.

And in *In re Rosoto, supra* at 949–50, the California Supreme Court, remarking that when counsel asks a specific question calling for a specific answer, the witness should respond to the question, neither evading nor volunteering matters not specifically asked for, said further:

It is thus apparent that when, as here, a witness' answers are literally true he may not be faulted for failing to volunteer more explicit information. Although such testimony may cause a misleading impression due to the

failure of counsel to ask more specific questions, the witness' failure to volunteer testimony to avoid the misleading impression does not constitute perjury because the crucial element of falsity is not present in his testimony. (Cf. *Bronston v. United States* (1973) 409 U.S. 352, 357–359 [34 L.Ed.2d 568, 573–574, 93 S.Ct. 595, 599–600]; *People v. Wong Fook Sam* (1905) 146 Cal. 114, 118 [79 P. 848]; *People v. Di Giacomo* (1961) 193 Cal.App.2d 688, 692 [14 Cal.Rptr. 574].)

Here, when the grand jury interrogator asked the petitioner whether he had delivered timbers to the Spane Mill, he did not identify the place which he had in mind with that precision which is required of such an interrogator, if a perjury charge is to be based upon the response to the question. He may or may not have had reference to Spane Building, for all the question indicated on its face. It was not the petitioner's duty to ask him to clarify that question. Not having delivered timbers to a place having that name, he could literally and truthfully answer in the negative.

The most that the State's evidence tended to prove was that the petitioner probably was not misled by the question asked him. This falls short of a showing that his answer was false and that he knew it to be so. And even assuming the evidence was strong enough to support a finding that the petitioner undoubtedly knew the interrogator's intent, the cases do not support a conclusion that this would render him guilty of perjury. As the cases collected in the annotation make clear, it is not the accused's knowledge of the questioner's intent which controls, but his knowledge of the falsity of his answer. If the answer is literally true, as was the case here, it cannot form the basis of a charge.

Since the evidence in any event was insufficient to support a guilty verdict, we need not inquire whether it met the requirements set forth in *State v. Buchanan,* 79 Wn.2d 740, 489 P.2d 744 (1971), and *State v. Wallis,* 50 Wn.2d 350, 311 P.2d 659 (1957).

We conclude that the Superior Court was correct in its order of dismissal, and that the Court of Appeals erred in reversing that order.

It has also been argued by the petitioner that the constitutional prohibition against placing a defendant twice in jeopardy prevents the ordering of a new trial in a case such as this. To this contention the State has responded with an excellent brief upon the question. Our determination upon the main issue makes it unnecessary to decide that question at this time.

The decision of the Court of Appeals is reversed and the judgment of the Superior Court is reinstated.

STAFFORD, WRIGHT, HICKS, and WILLIAMS, JJ., concur.

DOLLIVER, J. (dissenting)—Once again we have a demonstration of the maxim that the answer you get depends upon the question you ask. The majority looks upon this as a "literal truth" case, and it correctly cites the rule that a perjury charge cannot be maintained where the testimony of the accused was literally, technically or legally true (69 A.L.R.3d 993 (1976)), even if the answer was evasive and was intended to be misleading. *Bronston v. United States,* 409 U.S. 352, 34 L. Ed. 2d 568, 93 S. Ct. 595 (1973). I have no quarrel with the majority's view on this issue. But that is not the issue before the court.

The Court of Appeals (*State v. Olson,* 19 Wn. App. 885, 578 P.2d 866 (1978)), correctly states the two issues: (1) Was there sufficient evidence that the answer of defendant was false? and (2) Was there sufficient evidence that the answer of defendant was made with the knowledge of its falsity? The Court of Appeals also gives the correct answers.

Although the majority mentions these questions, it then proceeds to ignore them and moves off to announce the irrelevant legal proposition governing a "literal truth" case. This case involves questions of fact. With regard to the first issue, in the words of the Court of Appeals, "Granting all reasonable inferences to the State, we find substantial evidence in the record that Spane was called Spane Mill, or that it was in fact a mill regardless of its name. Therefore

the question of the truth or falsity of Olson's statement should have been submitted to the jury." *Olson,* at 891. I agree.

As to the second issue, the Court of Appeals also provides the correct answer:

> Applying this rule, we find substantial circumstantial evidence from which the jury could determine Olson's knowledge of falsity in two respects. The Spane Mill was one of several names by which the Spane Building Company in Stanwood was known. Olson had lived in Stanwood for some time, had worked for Spane and had in fact delivered timbers to Spane while a member of the bridge crew. There was testimony that other bridge crew employees knew the business as Spane Mill. All this supports a reasonable inference that Olson knew that "the Spane Mill" meant the Spane Building Company, and that with this knowledge he falsely denied taking timbers there.
>
> Furthermore, there was evidence that Spane had some of the characteristic equipment of a saw mill and could be considered as such. Because Olson once worked there and had delivered there more recently, it is a reasonable inference that he knew a question concerning "the Spane Mill" referred to the mill operation at the Spane Building Company, regardless of its proper name.

*Olson,* at 892.

There is substantial evidence that defendant both gave a false answer and knew he was giving a false answer. He is entitled to a trial by jury to make a factual determination of these issues. We should not deprive defendant of this right.

I would affirm the Court of Appeals.

UTTER, C.J., and BRACHTENBACH and HOROWITZ, JJ., concur with DOLLIVER, J.